UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARCHER WESTERN CONTRACTORS, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>INTERNATIONAL FIDELITY INSURANCE COMPANY, a New Jersey corporation,<br><br>Defendant. | Case No.: 16-CV-1494 JLS (BGS)<br><br>**ORDER (1) DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION TO DISMISS; AND (2) DENYING MOTION TO STRIKE**<br><br>(ECF No. 21) |

Presently before the Court is Defendant International Fidelity Insurance Company's Motion to Dismiss Counts I and II of Plaintiff's First Amended Complaint Pursuant to Rule 12(b)(6) or, in the Alternative, Motion to Strike Count I Pursuant to Rule 12(f). ("MTD," ECF No. 21.) Also before the Court are Plaintiff Archer Western Contractors, LLC's Opposition to Defendant's [Second] Motion to Dismiss, ("Opp'n," ECF No. 27), and Defendant's Reply Memorandum in Support of Motion to Dismiss. ("Reply," ECF No. 29.) After considering the parties' arguments and the law, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion to Dismiss and **DENIES** Defendant's alternative Motion to Strike.

1

## BACKGROUND

On or around July 7, 2011, Plaintiff entered into a written Subcontract Agreement (the "Subcontract") with Allied Industries, Inc. ("Allied") in connection with a project commonly known as the Point Loma WWTP Grit Processing Improvement Project located in San Diego, CA (the "Project"). (First Amended Complaint ("FAC") ¶ 5, ECF No. 14.) The City of San Diego is the owner of the Project, and Plaintiff is its general contractor. (*Id.*) Allied served as a subcontractor to Plaintiff pursuant to the Subcontract. (*Id.*)

Allied was contractually required to provide payment and performance bonds guaranteeing its performance of the work under the Subcontract. (*Id.* ¶ 6.) To that end, Defendant issued a Subcontractor Performance Bond on or around August 18, 2011, identified by Bond No. SU0567272 (the "Performance Bond") for Allied as principal and Plaintiff as obligee. (*Id.* ¶ 7.) Defendant also issued a Subcontractor Labor and Material Payment Bond, dated on or about September 14, 2011, identified by Bond No. SU0567272 (the "Payment Bond") for Allied as principal and Plaintiff as obligee. (*Id.* ¶ 8.) Allied's Subcontract amount was originally set at $334,450, but was later increased pursuant to one or more executed change orders to $519,691. (*Id.* ¶¶ 9–10.) From late 2012 through 2013, Allied's work on the Project grew progressively slower, and Allied ultimately abandoned the Project, thus allegedly breaching the Subcontract. (*Id.* ¶¶ 11–12.)

On or about April 11, 2013, Plaintiff sent Allied and Defendant notice that Allied was allegedly in default of the Subcontract. (*Id.* ¶ 13.) This correspondence advised Allied and Defendant that Plaintiff would proceed to mitigate damages through remedies available to Plaintiff under the Subcontract. (*Id.* ¶ 14; *see also* Ex. D.) On or about April 26, 2013, Plaintiff submitted a claim on the Bonds to Defendant and demanded Defendant respond to Plaintiff's declaration of Allied's default. (*Id.* ¶ 15; *see also* Ex. E.) Defendant allegedly breached the terms of the Performance Bond by, among other things, failing to perform according to the Bond. (*Id.* ¶ 16.) Defendant also allegedly attempted

2

16-CV-1494 JLS (BGS)

to impose pre-conditions on Plaintiff, which were not authorized under the terms of the Performance Bond. (*Id.* ¶ 30.) Plaintiff made multiple claims on the Bonds requesting Defendant's performance, but Defendant continued to fail and/or refuse to perform its obligations under the Bonds. (*Id.* ¶ 17.)

After Allied filed for bankruptcy, Plaintiff completed Allied's work as authorized by the terms of the Subcontract and the Bonds. (*Id.* ¶ 19.) To do so, Plaintiff hired other subcontractors, suppliers, and laborers to complete the work, thus incurring $815,442 in extended overhead, extended general conditions and lost production as a result of the delays caused by Allied's breach of the Subcontract. (*Id.* ¶¶ 20, 23.1.) Additionally, the Project was delayed by 108 days solely as a result of the delay caused by Allied, which caused Plaintiff $108,000 due to liquated damages of $1,000 per day. (*Id.* ¶ 23.2.) Finally, Plaintiff claims $83,760 in direct material and rental costs. (*Id.* ¶ 23.3.) In total, Plaintiff claims at least $1,007,203 in damages and losses. (*Id.* ¶ 23.)

Defendant previously moved to dismiss Plaintiff's complaint, which the Court denied in part and granted in part. ("Prior MTD Order," ECF No. 13.) The dismissal in the previous Order was without prejudice. (*Id.* at 9.) Accordingly, Plaintiff filed a First Amended Complaint, (ECF No. 14), which led to the Motion currently before the Court.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a party to raise by motion the defense that the complaint "fail[s] to state a claim upon which relief can be granted," generally referred to as a motion to dismiss. The Court evaluates whether a complaint states a cognizable legal theory and sufficient facts in light of Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8 "does not require 'detailed factual allegations,' . . . it [does] demand more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and

3

16-CV-1494 JLS (BGS)

conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A complaint will not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 677 (citing *Twombly*, 550 U.S. at 557).

In order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570); *see also* Fed. R. Civ. P. 12(b)(6). A claim is facially plausible when the facts pled "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 677 (citing *Twombly*, 550 U.S. at 556). That is not to say that the claim must be probable, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Facts "'merely consistent with' a defendant's liability" fall short of a plausible entitlement to relief. *Id.* (quoting *Twombly*, 550 U.S. at 557). Further, the Court need not accept as true "legal conclusions" contained in the complaint. *Id.* This review requires context-specific analysis involving the Court's "judicial experience and common sense." *Id.* at 678 (citation omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.*

## ANALYSIS

Plaintiff brings three causes of action against Defendant in its FAC: (1) Recovery on Performance Bond, (FAC ¶¶ 25–43), (2) Declaratory Relief, (*id.* ¶¶ 44–52), and (3) Claim on Payment Bond, (*id.* ¶¶ 53–64). Defendant only seeks to dismiss Plaintiff's first and second causes of action and does not contest the third cause of action. (MTD 8.)[1] Accordingly, the Court considers only Plaintiff's claim for recovery on the Performance Bond and its claim for Declaratory Relief.

Plaintiff alleges that Defendant breached its obligations under the Performance

---

[1] Pin citations refer to the CM/ECF page numbers electronically stamped at the top of each page.

4

16-CV-1494 JLS (BGS)

Bond by failing to timely elect one of its various options under the Performance Bond within fifteen days of receiving a notice of default. (FAC ¶¶ 27–29.) Defendant also allegedly attempted to impose pre-conditions on Plaintiff not authorized by the Performance Bond. Specifically, Defendant attempted to require Plaintiff to first subordinate Plaintiff's rights to Allied's Subcontract balance funds before Defendant would commit to perform the Subcontract work under the terms of the Performance Bond. (*Id.* ¶ 30.) Thus, Plaintiff seeks $1,007,203, which includes the penal sum limit of the Performance Bond of $519,961[2] as well as the additional cost above the penal sum due to Defendant's independent violations of the contract. (*Id.* ¶¶ 38, 40.) Plaintiff adds a new cause of action for declaratory relief arguing that Defendant waived the penal sum limit by failing to timely perform on the contract. (*Id.* ¶ 47.)

## I. Motion to Dismiss: Recovery on the Performance Bond

Defendant advances two broad arguments why any amount of damages above the penal sum is unrecoverable as a matter of law. First, Defendant argues that express terms of the bond preclude recovery above the penal sum. Second, Defendant argues that California statutory law limits its liability. The Court addresses each argument in turn.

### *A. Express Terms of the Performance Bond*

"In general, a surety bond is interpreted by the same rules as other contracts. That is, we seek to discover the intent of the parties, primarily by examining the words the parties have chosen." *First Nat'l Ins. Co. v. Cam Painting, Inc.* 173 Cal. App. 4th 1355, 1365 (2009) (citations omitted). "The extent of the surety's liability must be gathered from the language used when read in the light of the circumstances surrounding the transaction." *Id.* Defendant argues that Paragraphs 4 and 6 of the Performance Bond, when read together, state that Defendant cannot be liable for more than the penal sum. (MTD 17.) Paragraph 4 contains six options for Defendant to elect within 15 days of Plaintiff notifying Defendant of Allied's default. (FAC Ex. B.) Plaintiff alleges

---

[2] As before, the Court notes that this sum assumes Plaintiff can prove that the penal sum limit was properly increased from the original amount of $334,450 to $519,961. (*See* Prior MTD Order 5 n.1.)

5

16-CV-1494 JLS (BGS)

Defendant failed to make an election under Paragraph 4. (*Id.* ¶¶ 27–29.) Paragraph 6(b) states that Defendant shall be liable for "[t]he responsibilities of the Subcontractor for additional legal and design professional costs resulting or arising from the Subcontractor's default, or resulting or arising from the actions or *failure to act of the Surety* under Paragraph 4 herein." (*Id.* Ex. B.)

Defendant's argues that if it did indeed fail to act under Paragraph 4, as Plaintiff alleges, then any failure to act, as contemplated by Paragraph 6(b), must be read with Paragraph 6(d) which states "[t]he Surety's liability under this Paragraph 6 shall not exceed, in the aggregate, the penal sum." (MTD 17; FAC Ex. B.) Defendant's reading of the express terms of the Performance is plausible; however, this Court previously read Paragraph 6(b) as only applying to "additional legal and design costs." (Prior MTD Order 8.) Thus, costs other than additional legal and design costs would not be limited by Paragraph 6(d). Defendant does not address this language. That omission is not dispositive, but Plaintiff alleges none of its costs were legal or design—thus not covered by Paragraph 6(d). (FAC ¶ 40.) At this stage, Defendant has not demonstrated why this reading is not plausible.

Moreover, Plaintiff alleges that Defendant required pre-conditions from Plaintiff before Defendant took any action under the express terms of the Performance Bond at issue. (FAC ¶ 30; *see also* Opp'n 10.) Specifically, Plaintiff alleges that Defendant required Plaintiff to subordinate its rights to the Allied Subcontract balance funds[3] to Defendant before Defendant would commit to perform the Subcontract work. (FAC ¶ 30.) Defendant defends the requested precondition as proper under both the terms of the bond itself and well-established law. (MTD 19.)

First, Defendant points to various provisions within Paragraph 4 that contemplate

---

[3] The Performance Bond defines balance of Subcontract Price as "the amount of the Subcontract Price, including any amendments issued thereto prior to the declaration of default, less the amount paid by Obligee to Subcontractor in accordance with the terms of the Subcontract, and less any amounts for which Surety is liable under this Bond." (FAC Ex. B, ¶ 5.)

Defendant's use of the Subcontractor balance funds. (MTD 17–18.)[4] These provisions, taken independently, would support Defendant's contention that it was authorized to demand Plaintiff credit any remaining subcontract funds against its costs before seeking reimbursement from Defendant under the Performance Bond. Yet, Paragraph 4 cannot be read independent of Paragraph 5. Paragraph 5 specifically conditions Plaintiff's return of the Subcontractor balance funds upon "issuance of written notice by Surety to Obligee of the commitment to remedy the default through one of the options set forth in Paragraph 4." (FAC Ex. B.) Thus, Defendant had to send written notice of a Paragraph 4 election before Plaintiff was required to apply any Subcontractor balance funds. Neither party speaks to whether that event occurred or when, which given this stage in the litigation does not foreclose Plaintiff's allegations.

Defendant also counters that Plaintiff should have had to apply the remaining subcontract balance to reduce its losses before seeking reimbursement from Defendant. (MTD 18–19.) Otherwise, Plaintiff would benefit from a windfall by not paying for its original obligation and pushing the obligation entirely onto Defendant without the benefit of the contract funds. (*Id.* at 19.) While this concern is valid, it does not, by itself, excuse Defendant from taking some action under the Bond. Plaintiff concedes that Defendant would have rights in the Subcontract funds had it made an election under the Performance Bond. (Opp'n 11.) Further, California statute supports Defendant's claim for reimbursement had Defendant satisfied the principal's obligation. *See* Cal. Civ. Code §§ 2847–48.

In its Reply, Defendant points out that Plaintiff appears to change its position between the FAC and the Opposition Brief. (Reply 7.) In its Opposition, Plaintiff alleges that Defendant required actual payment of Subcontract funds before it would perform. (Opp'n 10 ("Clearly, the Bond does not provide that Plaintiff was required to pay

---

[4] Defendant notes that 4(a) references the Subcontract terms and conditions, which includes payment of the entire subcontract amount. (MTD 18.) 4(b) requires Defendant to obtain bids from replacement contractors and then Plaintiff pays the balance of the Subcontract Price. (*Id.*) 4(f) allows Plaintiff to complete any work and the cost to perform is credited against any remaining Subcontract balance. (*Id.*)

Defendant IFIC the balance of the Subcontract Price until IFIC committed to actually perform at all.").) Yet, in its FAC Plaintiff alleges that Defendant required Plaintiff to "subordinate [its] rights to [the] Allied Subcontract balance funds. (FAC ¶ 30.) This distinction does not change the Court's analysis—at its core Plaintiff alleges that Defendant attempted to extract some sort of remuneration (payment of funds or subordinate right to the funds) before electing an option under the Performance Bond. At this stage in the proceedings the pleadings need only be plausible on their face, but Plaintiff surely will need to clarify and specify the facts going forward.

Finally, Defendant argues that, as a matter of law, a surety has the right to apply the remaining contract funds to reduce the amount of the obligee's loss, i.e. the right of subrogation. Defendant's subrogation argument is misplaced. Defendant states the general rule that "there are few doctrines better established than that a surety who *pays* the debt of another is entitled to all the rights of the person he *paid* to enforce his right to be reimbursed." (MTD 18 (quoting *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136–37 (1962)).) Defendant correctly states the law, but does not apply it to this case. The rule in *Pearlman* only applies to sureties who have paid the debt of another and seek reimbursement. Defendant did not pay out any funds and *Pearlman* does not apply.[5] This is true in California where:

> The prerequisites to the assertion of a right of subrogation are these: '(1) Payment must have been made by the subrogee to protect his own interest. (2) The subrogee must not have acted as a volunteer. (3) The debt paid must be one for which the subrogee was not primarily liable. (4) The entire debt must have been paid. (5) Subrogation must not work any injustice to the rights of others.

*Am. Contractors Indem. Co. v. Saladino*, 115 Cal. App. 4th 1262, 1268 (Ct. App. 2004) (quoting *Caito v. United Cal. Bank*, 20 Cal.3d 694, 704 (1978)). Once a surety pays the debt in full then it has a "right of reimbursement implied in law." *Id.* at 1270.

---

[5] Additionally, California courts have noted that Supreme Court decisions are not controlling of state law. *See E. Quincy Servs. Dist. v. Gen. Accident Ins. Co. of Am.*, 88 Cal. App. 4th 239, 246 (Cal. App. 2001) ("[O]n questions of state law even U.S. Supreme Court decisions are not controlling…").

Defendant quotes California Civil Code § 2849, but does not further explain its applicability in any depth. Thus, while it is clear that a "surety is entitled to the benefit of every security for the performance of the principal obligation held by the creditor," Cal Civ. Code § 2849, it is not clear that the statutory language preempts the express language of the Performance Bond. Defendant may be able to show that, as a matter of law, Plaintiff had to apply the remaining Subcontract balance funds to any remedial work. Yet, Defendant has not demonstrated to the Court how this excuses following the requirements of Paragraphs 4, 5, and 6.

At this stage of the proceedings, the Court finds that Defendant has not demonstrated why, as a matter of law, Plaintiff's claims are not plausible. This is not to say that Defendant will not be able to later demonstrate that it did indeed follow the express terms of the contract, or that Plaintiff had to commit to applying the Subcontract Balance funds before Defendant made an election. At this stage, however, the Court declines to dismiss Plaintiff's claim on the express terms of the bond.

### B. *California Statutory Liability*

Defendant's second argument is that California statute limits liability to no more than the amount of the Penal Sum. (MTD 20.) Specifically, California Code of Civil Procedure § 996.470(a) limits liability to the amount of the bond (i.e. the penal sum). (*Id.*) In its first order, the Court stated that liability limitation in § 996.470 refers only to "breaches of the condition of the bond . . . [i]t does not limit liabilities of a surety which are imposed by statute rather than for breach of the condition of the bond." (Prior MTD Order 6 n.3 (quoting *Harris v. Nw. Nat'l Ins. Co.*, 6 Cal. App. 4th 1061, 1065 (Ct. App. 1992) (quotations omitted).) Indeed, *Harris* relied on § 996.475, which provides "[n]othing in this chapter is intended to limit the liability of a surety pursuant to any other statute. Cal. Civ. Proc. Code § 996.475; *Harris*, 6 Cal. App. 4th at 1065. Defendant argues that *Harris* only allows independent liability imposed by statute and concludes that none of the statutes cited by Plaintiff give rise to the statutory right to damages. (MTD 21.) Defendant examines several statutes but finds no relevant exception, nor does

Plaintiff point to any relevant statutory exception. (MTD 24–25; *see generally* FAC; Opp'n.) The Court agrees with Defendant insofar as there is no apparent statutory exception identified that meets the statutory exception in § 995.475.

The Court also cited *General Insurance Co. v. Mammoth Vista Owners' Ass'n*, 174 Cal. App. 3d 810, 827 n.10 (Ct. App. 1985), in its previous order. (Prior MTD Order 6 n.3.) At issue in *Mammoth Vista* was whether a surety was liable in "tort for breach of the implied covenant of good faith and fair dealing or for breach of statutory duties under the Unfair Practices Act (Ins. Code §790.03)." 174 Cal. App. 3d at 822. As Defendant correctly notes, this Court previously denied Plaintiff's claim to the extent it relied on Insurance Code § 790. (Prior MTD Order 9.) *Mammoth Vista* signaled—but did not hold—that a surety could be liable in tort for independent breaches of the bond. 174 Cal. App. 3d at 826 ("Under common law, an insurer who breaches the duty of good faith and fair dealing may be held liable in tort beyond the limits of the policy.") (citing *Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 574 (1973)). *Mammoth Vista* stated in a footnote that Code of Civil Procedure § 996.470 was "expressly limited to breaches of the *condition* of the bond." *Id.* at 827 n.10. Defendant correctly points out that *Mammoth Vista* did not foreclose an action in tort for independent violations and that the California Supreme Court later concluded that there is no tort recovery for a breach of the implied covenant of good faith and fair dealing in the context of a construction performance bond. *Cates Construction, Inc. v. Talbot Partners*, 21 Cal. 4th 28, 60 (1999). Defendant correctly states that *Cates* is controlling on the availability of a tort remedy. (MTD 22.)

That said, Defendant neglects to address the contractual remedy discussed in *Cates*. *Cates* dealt with whether an obligee could recover in tort against a surety for delay damages by the principal. 21 Cal. 4th at 38–39. The California Supreme Court stated, "[b]y now it is well established that a covenant of good faith and fair dealing is implicit in every contract. *Id.* at 43 (citations omitted). It went on to say that "[b]ecause the covenant of good faith and fair dealing essentially is a contract term that aims to effectuate the contractual intentions of the parties, 'compensation for its breach has

almost always been limited to contract rather than tort remedies.'" *Id.* (quoting *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 684–85 (1988)). *Cates* held that there is no tort remedy for breaches of good faith and fair dealing in a construction performance bond. *Id.* at 60. This does not mean there is no remedy whatsoever. *Cates* also held that "recovery for a surety's breach of the implied covenant of good faith and fair dealing is properly limited to those damages within the contemplation of the parties at the time the performance bond is given or at least reasonably foreseeable by them at that time." *Id.* at 61 (citing *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 516 (1994); and Cal. Civ. Code § 3300).

Defendant persuasively argues that there is no tort remedy for any independent violations of the terms of a construction bond, but has not shown that there is no remedy whatsoever for an independent violation. Indeed, the *Cates* Court declined to decide whether there was a breach of the terms of the bond specifically because it upheld the alternative grounds—i.e. contractual recovery for breach of good faith and fair dealing—to hold a surety liable. 21 Cal. 4th at 42 n.6. Thus, at this procedural stage, where the Court assumes all factual allegations to be true, it is plausible that Plaintiff could show there was a breach independent of the conditions of the contract warranting recovery.

In its Opposition, Plaintiff argues that the entire statutory scheme is inapplicable to the Performance Bond in this case. (Opp'n 14.) Section 996.470 lies within Chapter 2 of Title 14 of the California Code of Civil Procedure, which according to Plaintiff, only applies to statutory bonds and not common-law bonds. (Opp'n 14–15.) Defendant counters California law is the same for statutory and private bonds and points to several cases that might support this position. (Reply 3.) The Court does not have the benefit of Plaintiff's position on these cases. Furthermore, *Harris*, *Mammoth Vista*, and *Cates*, when read together, support the proposition that Section 996.470 does not apply to a surety's breach of good faith and fair dealing of a construction performance bond. Therefore, the Court declines to rule on whether § 996.470 entirely limits Defendant's liability.

In sum, Plaintiff plausibly states a claim that if proven, provides relief—at the very least up to amount of the Penal Sum on the Performance Bond. Given all the foregoing and limited to the current procedural posture, the Court **DENIES** Defendant's Motion to Dismiss as to Plaintiff's first cause of action.

## II. Motion to Strike: Recovery on the Performance Bond

In the alternative, Defendant argues that the Court should strike Plaintiff's complaint to the extent it is above the Penal Sum. Defendant's motion to strike falls under Federal Rule of Civil Procedure 12(f), which permits a court to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." "Motions to strike are 'generally disfavored because they are often used as delaying tactics and because of the limited importance of pleadings in federal practice.'" *Cortina v. Goya Foods, Inc.*, 94 F. Supp. 3d 1174, 1182 (S.D. Cal. 2015) (quoting *Rosales v. Citibank*, 133 F. Supp. 2d 1177, 1180 (N.D. Cal. 2001)). Accordingly, "motions to strike should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." *Colaprico v. Sun Microsys., Inc.*, 758 F. Supp. 1335, 1339 (N.D. Cal. 1991). "When ruling on a motion to strike, this Court 'must view the pleading under attack in the light most favorable to the pleader.'" *Id.* (citing *RDF Media Ltd. v. Fox Broad. Co.*, 372 F. Supp. 2d 556, 561 (C.D. Cal. 2005)).

Defendant asks the Court to strike any allegations that are not supported by California law. (MTD 15.) Defendant provides no other reason why the allegations have no possible bearing on this case. (*Id.*) Furthermore, the foregoing discussion in Section I, *supra*, demonstrates that pleadings in this case have at least some bearing on the subject matter of the litigation. Accordingly, the Court **DENIES** Defendant's Motion to Strike.

## III. Motion to Dismiss: Declaratory Relief

Plaintiff seeks declaratory relief that Defendant has, by its failure to act, waived the Penal Sum limit. (FAC ¶ 47.) Plaintiff also argues Defendant is estopped from claiming the Penal Sum, again for the same reason: a failure to perform. (*Id.* ¶ 48.) In support of its second cause of action, Plaintiff recites a litany of statutes regarding general rules of

interpretation. (*Id.* ¶¶ 46, 48–50.)

A district court cannot grant declaratory relief unless there is an "actual controversy" within the meaning of the Declaratory Judgment Act. *See* 28 U.S.C. § 2201 ("In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."); *see also Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 272 (1941) ("[T]he District Court is without power to grant declaratory relief unless ... a[n actual] controversy exists."). Furthermore, courts regularly deny requests for declaratory relief when they are duplicative of other claims—"[a] claim for declaratory relief is unnecessary where an adequate remedy exists under some other cause of action." *Mangindin v. Wash. Mut. Bank*, 637 F. Supp. 2d 700, 707–08 (N.D. Cal. 2009) (finding plaintiff's declaratory relief claim duplicative and unnecessary because it was "entirely commensurate with the relief sought through [plaintiff's] other causes of action"); *see Permpoon v. Wells Fargo Bank Nat'l Ass'n*, No. 09-CV-01140-H (BLM), 2009 WL 3214321, at *5 (S.D. Cal. Sept. 29, 2009) (finding the plaintiffs' declaratory relief claim "duplicative and unnecessary" because the relief sought was the same as the plaintiffs' other causes of action); *see also Kimball v. Flagstar Bank F.S.B.*, 881 F. Supp. 2d 1209, 1220 (S.D. Cal. 2012) (dismissing the plaintiffs' claim for declaratory relief because it was "based upon the same allegations supporting their other causes of action").

Here, Plaintiff's declaratory relief claim is duplicative of Plaintiff's other claim—i.e., there is an adequate remedy at law for the violation encompassed in Plaintiff's declaratory relief cause of action. The relief sought in both causes of action is the same—namely to be paid $1,007,203 for completing the Project. The Court, without deciding whether the statutory sections cited by Plaintiff may be applicable in another context or argument, finds declaratory relief not appropriate when Plaintiff has other adequate relief. Accordingly, Plaintiff's request for declaratory relief fails. The Court **GRANTS IN PART** Defendant's Motion to Dismiss and **DISMISSES WITHOUT PREJUDICE**

Plaintiff's second cause of action.

## CONCLUSION

Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion to Dismiss (ECF No. 21) and **DISMISSES WITHOUT PREJUDICE** Plaintiff's second cause of action. The Court also **DENIES** Defendant's alternative Motion to Strike.

**IT IS SO ORDERED.**

Dated: September 27, 2017

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge